ORAL ARGUMENT NOT YET SCHEDULED

No. 18-1149 (and consolidated cases)

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

ENVIRONMENTAL DEFENSE FUND, ET AL.,
*Petitioners*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
*Respondents.*

---

ON PETITIONS FOR REVIEW OF FINAL AGENCY ACTIONS OF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, 83 FED. REG. 13,745 (MAR. 30, 2018), 85 FED. REG. 74,890 (NOV. 24, 2020), 86 FED. REG. 57,585 (OCT. 18, 2021), 90 FED. REG. 34,206 (JULY 21, 2025)

**PETITIONERS' PROOF OPENING BRIEF**

Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 977-5769
sanjay.narayan@sierraclub.org

*Counsel for Sierra Club*

November 14, 2025

Keri N. Powell
Southern Environmental Law Center
10 10th Street NW, Ste. 1050
Atlanta, GA 30309
(917) 573-8853
kpowell@selc.org

*Counsel for Sierra Club and Environmental Integrity Project*

*(Complete Counsel Listing Appears on Signature Page)*

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Petitioners submit the following Certificate as to Parties, Rulings, and Related Cases.

A. PARTIES

The parties, amici, and entities in these consolidated proceedings are as follows:

Petitioners:

18-1149: Environmental Defense Fund, Natural Resources Defense Council, and Sierra Club.

21-1039, 21-1259 & 25-1179: Environmental Defense Fund, Environmental Integrity Project, Natural Resources Defense Council, and Sierra Club

Respondents:

18-1149, 21-1039, 21-1259 & 25-1179: Environmental Protection Agency and Lee M. Zeldin

Intervenor-Applicants:

18-1149: Air Permitting Forum, Chamber of Commerce of the United States of America, National Association of Manufacturers, American Chemistry Council, American Coke and Coal Chemicals

Institute, American Forest and Paper Association, American Fuel and Petrochemical Manufacturers, American Iron and Steel Institute, American Petroleum Institute, American Wood Council, Auto Industry Forum, Brick Industry Association, Council of Industrial Boiler Owners, Fertilizer Institute, Portland Cement Association, Utility Air Regulatory Group, and National Development Association's Clean Air Project.

21-1039: Air Permitting Forum, American Chemistry Council, American Coke and Coal Chemicals Institute, American Forest and Paper Association, American Fuel and Petrochemical Manufacturers, American Iron and Steel Institute, American Petroleum Institute, American Wood Council, Auto Industry Forum, Council of Industrial Boiler Owners, Portland Cement Association.

Amici:

There are presently no amici.

## B. RULINGS UNDER REVIEW

The petitioners in Case No. 18-1149 seek review of EPA's memorandum titled "Project Emissions Accounting Under the

New Source Review Preconstruction Permitting Program," published at 83 Fed. Reg. 13,745 (Mar. 30, 2018)

The petitioners in 21-1039 seek review of EPA's rule titled "Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NNSR): Project Emissions Accounting," 85 Fed. Reg. 74,890 (Nov. 24, 2020)

The petitioners in Case No. 21-1259 seek review of EPA's action titled "Denial of Petition for Reconsideration and Administrative Stay: 'Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NNSR): Project Emissions Accounting,'" published at 88 Fed. Reg. 57,585 (Oct. 18, 2020)

The petitioners in Case No. 25-1176 seek review of EPA's action titled "Prevention of Significant Deterioration (PSD) and Nonattainment New Source Review (NNSR): Regulations Related to Project Emissions Accounting; Withdrawal of Proposed Rule," 90 Fed. Reg. 34,206 (July 21, 2025).

## C. RELATED CASES

The petitions on review have not previously been before this Court or any other court. Counsel for petitioners are unaware of any currently

pending related cases within the meaning of DC Circuit Rule

28(a)(1)(C).

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Petitioners make the following disclosures:

## Environmental Defense Fund

Environmental Defense Fund is a national non-profit organization, organized under the laws of the State of New York, that links science, economics, and law to create innovative, equitable, and cost-effective solutions to urgent environmental problems.

Environmental Defense Fund does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

## Environmental Integrity Project

Environmental Integrity Project, a corporation organized and existing under the laws of the District of Columbia, is a national non-profit organization that advocates for more effective enforcement of environmental laws.

Environmental Integrity Project does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in it.

**Natural Resources Defense Council**

Natural Resources Defense Council, a corporation organized and existing under the laws of the State of New York, is a national nonprofit organization dedicated to improving the quality of the human environment and protecting the nation's endangered natural resources.

Natural Resources Defense Council does not have any parent corporations and no publicly held corporation has a ten percent or greater ownership in it.

**Sierra Club**

Sierra Club is a non-profit corporation organized under the laws of the State of California. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

Sierra Club does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in Sierra Club.

TABLE OF CONTENTS

Certificate as to Parties, Rulings, and Related Cases .............................. i

Rule 26.1 Disclosure Statement ....................................................... v

Table of Authorities ...................................................................... ix

Glossary of Abbreviations .............................................................. xii

Introduction ............................................................................... 1

Jurisdiction ................................................................................ 3

Statutes and Regulations ................................................................ 4

Issues Presented .......................................................................... 4

Statement .................................................................................. 5

    A.  Statutory Framework: The Clean Air Act and New Source Review ................................................................................. 6

    B.  Regulatory Background: Modifications and Netting ............. 9

        1.    Alabama Power: Source-Wide Contemporaneous Netting and De Minimis Changes .................................. 9

        2.    EPA's 1980 Regulations and Two-Step Approach to Measuring Emissions Increases and Decreases ......... 12

        3.    EPA's 2002 Regulations: Inserting "Project" as a Shorthand for a Physical or Operational Change ....... 15

            a.  EPA's Addition of "Project" into its Two-Step Analysis. ................................................................. 16

            b.  "Reasonable Possibility" Recordkeeping ................ 17

        4.    EPA's Proposed "Project Netting" Regulations ........... 18

        5.    Netting Before Project Accounting: Safeguards Preventing Pollution Increases from Escaping New Source Review ............................................................ 21

    C.  Actions Under Review: EPA's Adoption of Project Netting as "Project Emissions Accounting" ........................................... 22

        1.    The Pruitt Memo and Project Accounting Rule .......... 22

        2.    EPA's Reconsideration Proposal and Reopening of Project Accounting. .................................................... 29

D. Conclusion ..................................................................32

Summary..........................................................................34

Standing ..........................................................................35

Standard of Review ........................................................40

Argument ........................................................................41

I. EPA Claims No Valid Statutory Authority for Project Accounting, Because Ambiguity Is Not a Grant of Agency Authority. ................................................................41

II. Project Accounting Unlawfully Excludes Changes Producing Emissions Increases from a "Modification" Requiring New Source Review. ...............................................................52

A. By Allowing a Source to Delay Emission Decreases for Years After a Change Causes a Significant Emissions Increase, Project Accounting Contradicts the Statutory Definition of "Modification." ...............................................................52

B. The "Substantially Related" Test Does Not Assure Contemporaneity, or Square Project Accounting with the Statute. .............................................................59

III. EPA Has Not Explained How Its "Reasonable Possibility" Recordkeeping Rules Ensure Compliance with Project Accounting...............................................................61

IV. EPA Has Arbitrarily Premised Project Accounting on Limitations It Has Not Imposed. .............................65

Conclusion........................................................................69

Certificate of Compliance ...............................................71

Certificate of Service ......................................................72

# TABLE OF AUTHORITIES

CASES

*Alabama Power Co. v. Costle,*
636 F.2d 323 (D.C. Cir. 1979)..................................................*passim*

*Alaska Dep't of Env't Conservation v. EPA,*
540 U.S. 461 (2004) ....................................................................8

*Appalachian Power Co. v. EPA,*
208 F.3d 1015 (D.C. Cir. 2000). ................................................5

*Cal. Cmtys. Against Toxics v. EPA,*
928 F.3d 1041 (D.C. Cir. 2019) ..........................................36, 39

*Calcutt v. FDIC,*
598 U.S. 623 (2023) ..................................................................43

*Cochise Consultancy, Inc. v. United States,*
587 U.S. 262 (2019) ............................................................46, 49

*Earthworks v. DOI,*
105 F.4th 449 (D.C. Cir. 2024)................................................39

*Isigna v. Comm'r,*
149 F.4th 709 (D.C. Cir. 2025)................................................43

*King v. Burwell,*
576 U.S. 473 (2015) ..................................................................58

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024). ...........................................................*passim*

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
463 U.S. 29 (1983) ...................................................................65

*Nat'l Sec. Archive v. CIA,*
104 F.4th 267 (D.C. Cir. 2024) ...............................................40

*New Jersey v. EPA,*
989 F.3d 1038 (D.C. Cir. 2021) ...............................................64

*New York v. EPA,*
413 F.3d 3 (D.C. Cir. 2005) .................................................*passim*

*New York v. EPA,*
443 F.3d 880 (2006) .............................................................*passim*

*NRDC v. EPA,*
725 F.2d 761 (D.C. Cir. 1984)..................................................7

*Nucor-Steel Arkansas v. Pruitt,*
246 F.Supp.3d 288 (D.D.C. 2017) .........................................15

*Ohio v. EPA,* 603 U.S. 279 (2024) .........................................68

*PETA v. U.S. Dep't of Agric.,*
797 F.3d 1087 (D.C. Cir. 2015) .............................................40

*Portland Cement Ass'n v. EPA,*
665 F.3d 177 (D.C. Cir. 2011)..........................................67, 68

*Sierra Club v. EPA,*
863 F.3d 834 (D.C. Cir. 2017)................................................44

*Stern Produce Co. v. NLRB,*
97 F.4th 1 (D.C. Cir. 2024) .............................................44, 45

*Wildearth Guardians v. Jewell,*
738 F.3d 298 (D.C. Cir. 2013)................................................39

STATUTES

42 § U.S.C. 7607................................................................41

42 U.S.C. § 7401..................................................................6

42 U.S.C. § 7407..................................................................6

42 U.S.C. § 7409..................................................................6

42 U.S.C. § 7410.............................................................6, 58

42 U.S.C. § 7411(a) ......................................................*passim*

42 U.S.C. § 7470..................................................................8

42 U.S.C. § 7475(a) ......................................................*passim*

42 U.S.C. § 7479..................................................................8

42 U.S.C. § 7501..................................................................8

42 U.S.C. § 7502..................................................................6

42 U.S.C. § 7503(a) ......................................................*passim*

42 U.S.C. § 7604................................................................40

42 U.S.C. § 7607.................................................................3, 41, 43

REGULATIONS

40 C.F.R. § 51.165....................................................................8
40 C.F.R. § 51.166....................................................................8
40 C.F.R. § 52.21 ...............................................................passim
40 C.F.R. § 70.7......................................................................40

FEDERAL REGISTER

43 Fed. Reg. 26,380 (June 19, 1978) .......................................10
45 Fed. Reg. 52,676 (Aug. 7, 1980) ....................................passim
61 Fed. Reg. 38,250 (July 23, 1996) ...................................passim
63 Fed. Reg. 39,857 (July 24, 1998) ................................14, 16
67 Fed. Reg. 80,186 (Dec. 31, 2002) ............................9, 15, 44
71 Fed. Reg. 54,235 (Sept. 14, 2006)..............................19, 21
72 Fed. Reg. 72,607 (Dec. 21, 2007) ..........................18, 62, 63
74 Fed. Reg. 2,376 (Jan. 15, 2009) ........................................20
83 Fed. Reg. 13,745 (Mar. 30, 2018) .....................................4, 5
83 Fed. Reg. 57,324 (Nov. 15, 2018)...........................27, 28, 67
84 Fed. Reg. 39,244 (Aug. 9, 2019) ...........................41, 56, 64
85 Fed. Reg. 74,890 (Nov. 24, 2020).................................passim
86 Fed. Reg. 57,585 (Oct. 18, 2021) .....................................4, 6
89 Fed. Reg. 36,870 (May 3, 2024).....................................passim
90 Fed. Reg. 21,232 (May 19, 2025)........................................67
90 Fed. Reg. 34,206 (July 21, 2025) ...........................4, 6, 32, 59

# GLOSSARY OF ABBREVIATIONS

JA: Joint Appendix

EPA: Environmental Protection Agency

NSR: New Source Review

Congress enacted the Clean Air Act's New Source Review programs to ensure that major industrial facilities employ up-to-date pollution controls, enable informed public participation during any decision to increase such facilities' pollution, and protect air quality. 42 U.S.C. §§ 7475(a), 7503(a). Existing plants must comply with New Source Review before undertaking a "modification," which the Act defines as "any" physical or operational "change" which "increases the amount of any air pollutant emitted by [the] source." *Id.* § 7411(a)(4). One persistent question arising under that definition is: When is a change that increases a source's emissions *not* a modification—and thus not subject to New Source Review—because of decreases elsewhere within the source?

For nearly four decades—from this Court's decision in *Alabama Power Co. v. Costle,* until the actions under review here—the Environmental Protection Agency (EPA) answered that question by measuring emissions increases across a source-wide "bubble," reflecting the statute's central concern with "industrial changes" that "might increase pollution in [the] area" surrounding the source. 636 F.2d 323,

1

400-01 (D.C. Cir. 1979). Under that longstanding approach, any source relying on offsetting decreases to avoid New Source Review could only do so if: (1) the decreases were contemporaneous with the planned increase in the source's emissions, occurring both before and within the same time period as the increases; (2) the decreases were enforceable, so that they were sure to occur; and (3) the source accounted for *all* increases and decreases at the source, thereby capturing its actual, real-world pollution.

The actions under review upended that regime by adding an entirely new netting methodology—one that operates on a "project" rather than source-wide basis. That new methodology eliminates all three of the above-described safeguards. Sources may rely on decreases that are not contemporaneous—indeed, they may rely on decreases that *follow* significant increases by years. Sources may rely on decreases that are not enforceable; EPA's regulations provide no way to reliably ensure that they occur. And sources need not account for other increases occurring at the source; they may avoid review even where the sum total of a facility's contemporaneous activities significantly increase its real-world pollution.

2

Those actions are unlawful. EPA based them entirely on policy-making authority the Agency discovered in statutory ambiguity. That authority does not exist. *Loper Bright Enters. v. Raimondo,* 603 U.S. 369 (2024). EPA's actions cannot, moreover, be squared with the statute. They impute two inconsistent meanings to the same statutory terms—a "change" that "increases" emissions. 42 U.S.C. § 7411(a)(4). And they exclude years-long emissions increases from the Act's definition of a "modification," despite that definition's sweeping inclusion of "any" change producing an increase. *Id.*

EPA's actions are also arbitrary. The Agency has not explained how permitting agencies can ensure that promised decreases occur, when they are neither enforceable nor consistently tracked and reported. And EPA admits that its rules threaten circumvention of the Act's requirements absent application of limiting principles that it has expressly allowed permitting authorities to ignore.

## JURISDICTION

These consolidated petitions each seek review of a nationally applicable final EPA action under the Clean Air Act. This Court has jurisdiction under 42 U.S.C. § 7607(b)(1). The petitions were timely filed

on May 29, 2019, January 22, 2021, December 10, 2021, and August 18, 2025. *See* 83 Fed. Reg. 13,745 (Mar. 30, 2018); 85 Fed. Reg. 74,890 (Nov. 24, 2020); 86 Fed. Reg. 57,585 (Oct. 18, 2021); 90 Fed. Reg. 34,206 (July 21, 2025).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in an appendix.

## ISSUES PRESENTED

1. The Clean Air Act defines a "modification" requiring New Source Review as "any" physical or operational "change" at a source that "increases the amount of any air pollutant emitted by such source." 42 U.S.C. § 7411(a)(4). Is EPA's adoption of "project accounting" based on the best reading of those terms where:

(a) EPA's sole asserted authority is policy-making discretion conferred by statutory ambiguity;

(b) EPA has adopted two divergent understandings of when a "change" produces an "increase" in emissions; and

(c) EPA's interpretation excludes changes producing multi-year significant increases in pollution?

2. Whether EPA acted arbitrarily by promulgating "project accounting" without reasonably explaining how compliance can be assured when sources avoid New Source Review based on unenforceable emission decreases with no required post-change recordkeeping.

3. Whether EPA's adoption of "project accounting" rules predicated on safeguards that EPA has expressly permitted states to ignore is arbitrary and capricious.

STATEMENT

These petitions challenge several final actions by which EPA adopted "project accounting," a new methodology for determining when a physical or operational change to an existing major source of air pollution is a "modification" subject to the Clean Air Act's New Source Review requirements. 42 U.S.C. § 7411(a)(4). Those actions are: (1) a memorandum[1] and final rule adopting the methodology, 83 Fed. Reg. 13,745 (Mar. 30, 2018); 85 Fed. Reg. 74,890 (Nov. 24, 2020); and (2)

---

[1] The memorandum was a final action subject to review: it established "a position [EPA] plans to follow in reviewing" state "permits," and "a position EPA officials in the field are bound to apply." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022-23 (D.C. Cir. 2000). But regardless EPA has codified it into a final rule. 85 Fed. Reg. at 74,890.

5

EPA's withdrawal of a proposed rulemaking reconsidering the methodology, 90 Fed. Reg. 34,206 (July 21, 2025).[2]

*A. Statutory Framework: The Clean Air Act and New Source Review*

The Clean Air Act seeks "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b). To those ends, the Act requires EPA to establish national air quality standards for dangerous air pollutants, *id.* § 7409, and to determine which areas of the country are attaining those standards. *Id.* § 7407. The Act then requires states to develop "implementation plans" subject to EPA review and approval that will bring areas with pollution exceeding air-quality standards ("nonattainment" areas) into compliance, as well as plans to prevent deterioration in areas attaining the standards ("attainment" areas). *Id.* §§ 7410, 7502.

---

[2] One of the consolidated petitions challenges EPA's initial refusal to begin mandatory reconsideration proceedings. 86 Fed. Reg. at 57,585. That petition is substantively coextensive with petitioners' challenge to EPA's withdrawal of its proposed reconsideration rulemaking.

State plans must include "a preconstruction review process for new or modified sources located in 'nonattainment' areas," and "a parallel preconstruction review process" in attainment areas—collectively, "New Source Review" or "NSR." *New York v. EPA,* 413 F.3d 3, 12-13 (D.C. Cir. 2005).[3] These New Source Review programs—meant as "[t]he central elements in [the Act's] comprehensive scheme"—require "all major new 'stationary' sources of pollution as well as all existing 'stationary' sources that [are] being significantly modified to obtain a permit before construction." *NRDC v. EPA,* 725 F.2d 761, 764 (D.C. Cir. 1984).

That preconstruction permitting program demands, *inter alia*, that new and modified sources adopt effective, up-to-date pollution control technologies, 42 U.S.C. §§ 7475(a)(4), 7503(a)(2), and that they do not cause or contribute to violations of air quality standards, *id.* §§ 7475(a)(2)-(3), 7503(a)(1)-(2). New Source Review also includes procedures ensuring "careful evaluation of all the consequences" of any decision to "permit increased air pollution," and adequate "opportunities

[3] EPA calls the attainment-area review program "Prevention of Significant Deterioration" review.

for informed public participation," *id*. §§ 7470, 7475(a)(2). *See id*.

§ 7503(a)(5).

The Act defines a "modification" requiring New Source Review

(under both the attainment and non-attainment programs) as:

> [A]ny physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

*Id*. §§ 7411(a)(4), 7479(2)(C); 7501(4). As a result, when "plants increase

pollution, they will generally need a permit." *Alabama Power,* 636 F.2d

at 400.

Under the Act's cooperative federalism system, states administer

New Source Review through their implementation plans. *Alaska Dep't*

*of Env't Conservation v. EPA,* 540 U.S. 461, 471-72 (2004). EPA's

regulations specify the necessary contents of those plans, 40 C.F.R. §§

51.165, 51.166, and set the rules for those areas without an approved

state plan (where EPA remains responsible for New Source Review

permitting), *id*. § 52.21.[4] *See New York*, 413 F.3d at 21 ("[T]he Act gives

EPA responsibility for developing basic rules for the NSR program.").

---

[4] The three sets of regulations do not materially differ. For simplicity's sake, further citations are to 40 C.F.R. § 52.21 alone.

*B. Regulatory Background: Modifications and Netting*

This case concerns EPA's interpretation of the Act's definition of a "modification" subject to New Source Review, *i.e.* a physical or operational "change" which "increases the amount of any air pollutant emitted by [the] source," 42 U.S.C. § 7411(a)(1). It centers on the following question: when are changes that increase pollution at the source *not* a modification, because they are accompanied by other off-setting decreases?

### 1. *Alabama Power: Source-Wide Contemporaneous Netting and De Minimis Changes*

EPA first answered that question in 1978, directly following congressional adoption of the current New Source Review program in 1977.[5] In fact, EPA promulgated regulations adopting two different answers. The first required a source to comply with the program's control-technology requirements only when changes increased source-wide emissions—that is, produced a "net increase in emissions … taking into account all emission increases and decreases at the source." 43 Fed.

---

[5] EPA's rulemakings have focused on NSR in attainment areas; but its definitions of "modification" apply in nonattainment areas as well. *See* 67 Fed. Reg. 80,186, 80,188 (Dec. 31, 2002) (noting that both programs utilize same definition of "major modification").

Reg. 26,380, 26,385 (June 19, 1978). The second required a source to comply with all other requirements when a change increased emissions at the source, "regardless of any emission reductions achieved elsewhere in the source"—*i.e.,* if a change increased pollution from any unit (that is, a polluting component) within the source, regardless of offsetting decreases. *Id.* at 26,382.

In *Alabama Power,* this Court upheld only the first, source-wide approach. It interpreted the statute to require EPA to "look at any change proposed for a plant, and decide whether the net effect of all the steps involved in that change is to increase the emission of any air pollutant." 636 F.2d at 401. Measuring an increase within a "bubble" encompassing the entire facility effectuated Congress' "wish[] to apply the permit process … only where industrial changes might increase pollution in an area." *Id.*

*Alabama Power* found "no basis in the Act," however, "for establishing *two different* definitions of 'modification.'" 636 F.2d at 403 (emphasis added). The Court therefore refused to allow EPA to maintain its parallel, non-source-wide definition of "modification" that "inspect[ed] the individual units of a plant, which are affected by an

operational change, and determine[d] whether any of the units will consequently emit more of a pollutant." *Id.* at 401-02 (refusing to approve approach that "allow[s] offsets" within some "combination of facilities" within a source) (citation omitted).

The Court further identified two guardrail principles necessary to reconcile that source-wide "bubble" with the statutory definition of a modification. First, "any offset changes claimed by industry must be *substantially contemporaneous*" (leaving EPA with "discretion, within reason, to define which changes are substantially contemporaneous") *Id.* at 402. Second, "the offsetting changes must be within the same source, as defined by EPA." *Id.*

In addressing other aspects of EPA's regulations, *Alabama Power* also held that EPA had authority to adopt *de minimis* exemptions for matters of "trivial or no value," but underscored that such authority was "narrow in reach and tightly bounded" and could not be invoked merely because EPA believed that the "benefits" of New Source Review "are exceeded by the costs." *Id.* at 361, 365.

## 2. EPA's 1980 Regulations and Two-Step Approach to Measuring Emissions Increases and Decreases

EPA responded with regulations that defined a "major modification" as "any physical change in or change in the method of operation of a major stationary source that would result in a [1] *significant* [2] *net* emissions increase of any pollutant subject to regulation under the Act." 45 Fed. Reg. 52,676, 52,735 (Aug. 7, 1980) (40 C.F.R. § 52.21(b)(2)(i) (1980)) (emphases added). Those regulations divided the assessment of whether there has been a modification requiring New Source Review into two steps. *See* 61 Fed. Reg. 38,250, 38,253 (July 23, 1996) (The "definition contemplates a two-step test for determining whether activities" at an existing source "constitute a major modification").

At the first step permitting authorities (states or EPA) assessed—without regard to any emission decreases—whether the proposed change would produce a *significant increase* in emissions, reflecting EPA's invocation of the *de minimis* authority sanctioned by *Alabama Power.* 45 Fed. Reg. at 52,698 (EPA "define[s] 'significant' in terms of *de minimis* thresholds for each pollutant subject to regulation"). EPA specified separate *de minimis* (or "significance") levels, in tons per year, for each pollutant. *See* 40 C.F.R. § 52.21(b)(23) (current significance

levels, mostly between 10-40 tons per year). If the increase resulting from the change was below those levels, the analysis ended: The change was not a modification requiring New Source Review.

For any significant (non-*de minimis*) change, the regulations required permitting authorities to proceed to a second step: determining whether there would be a "net increase" at the source, adopting *Alabama Power*'s understanding of "modification" as meaning "any net increase in emissions that would result [from] 'contemporaneous' changes at a major stationary source." 45 Fed. Reg. at 52,700. EPA accordingly defined a "net emissions increase" as:

> the amount by which the sum of the following exceeds zero: (a) Any *increase* in actual emissions from a particular physical change or change in method of operation at a stationary source; and (b) Any other *increases* and *decreases* in actual emissions at the source that are contemporaneous with the particular change and are otherwise creditable.

*Id.* at 52,736 (40 C.F.R. § 52.21(b)(3)(i)) (emphases added). In other words, a source proposing a change that would significantly increase its emissions could avoid New Source Review based on offsetting "decreases" elsewhere at the plant, but *only* through a source-wide assessment of all contemporaneous increases and decreases at the

source. *Id. See* JA___ (EPA-HQ-OAR-2018-0048-0016 ("Finazzo Memo") at 2-3) (describing "historic two step NSR applicability test").

EPA defined "contemporaneous" changes as those occurring "between the date five years *before* construction 'commences' on a proposed physical or operational change and the date the increase in 'actual emissions' from that change occurs," 45 Fed. Reg. at 52,701, 52,736 (emphasis added). This ensured that the decrease preceded any increase, as required to prevent "increase[d] pollution in an area" without New Source Review. *Alabama Power*, 636 F.2d at 401. EPA further specified that to be "creditable" a decrease must be "enforceable at and after the time that actual construction on the particular change [increasing emissions] begins," to ensure "that the decrease is real" and "remains in effect." 45 Fed. Reg. at 52,701, 52,736.

These regulatory requirements, EPA later confirmed, recognized that "regulations limiting netting to less than a plantwide scope" would "conflict[] with the language and purpose of the Act." 63 Fed. Reg. 39,857, 39,863 (July 24, 1998). They therefore required that "when *any* emissions decrease is claimed (including those associated with the proposed modification)" to offset an increase, "*all* source-wide creditable

14

and contemporaneous emissions increases and decreases of the pollutant … must be included in the … applicability determination." JA___ (EPA-HQ-OAR-2022-0381-0060 ("Pet. Comments") Att. 3 (EPA's New Source Review Workshop Manual) at A.36) (emphases added). *See Nucor-Steel Arkansas v. Pruitt,* 246 F.Supp.3d 288, 303 (D.D.C. 2017) (then-Judge Ketanji Brown Jackson, noting that New Source Review Workshop Manual contains EPA's view of "the mechanics" of the NSR "regulatory regime").

### 3. EPA's 2002 Regulations: Inserting "Project" as a Shorthand for a Physical or Operational Change

In 2002, EPA revised its regulations to adopt an "actual-to-projected-actual test" to measure emissions increases from modifications at "all existing emissions units." *New York*, 413 F.3d at 16. That test calculated such increases by comparing the source's past pollution to a projection of its actual future emissions, rather than to its maximum "potential" emissions. *See id.* at 16-18. EPA also made other assorted changes, but did not purport to alter the above-described two-step methodology. 67 Fed. Reg. 80,186, 80,187-88 (Dec. 31, 2002) (describing amendments).

*a. EPA's Addition of "Project" into its Two-Step Analysis.*

In implementing those changes, EPA introduced a new term: "project," shorthand for the statutory phrase, "a physical change in, or change in the method of operation of, an existing major stationary source." 40 C.F.R. § 52.21(b)(52). The agency otherwise replicated the existing two-step definition of a modification: "[A] *project* is a major modification … if it causes two types of emissions increases—a significant emissions increase … and a significant net emissions increase." *Id.* § 52.21(a)(2)(iv)(a) (emphasis added). EPA did not indicate that it was thereby substantively changing its methodology, much less repudiating its understanding that "regulations limiting netting to a less than plantwide scope" would conflict "with the language and purpose of the Act," 63 Fed. Reg. at 39,863.

The amended regulations thus continued to define Step 1 of the applicability analysis—"a significant emissions increase"—as an increase exceeding numeric thresholds that EPA deemed *de minimis*. 40 C.F.R. § 52.21(b)(23), (40); 61 Fed. Reg. at 38,253-54. And they continued to define a "significant *net* emissions increase" (Step 2)

16

accounting for any off-setting decreases, along with increases, at the source, as:

> [T]he amount by which the sum of the following exceeds zero: (A) [t]he increase in emissions from a particular physical change or change in method of operation at a stationary source…; and (B) Any other increases or decreases in actual emissions at the major stationary source that are contemporaneous with the particular change and are otherwise creditable.

*Id.* § 52.21(b)(3)(i). *See* 61 Fed. Reg. at 38,253 (At "second step" permitting authority "determine[s] whether the … change will result in an emissions increase" using the "'plantwide bubble' concept" endorsed by *Alabama Power*).

EPA retained the requirements that any offsetting decreases used to avoid New Source Review be "contemporaneous" and "enforceable" without substantive change. 40 C.F.R. § 52.21(b)(3)(ii)-(iii).

### b. *"Reasonable Possibility" Recordkeeping*

EPA's 2002 amendments also imposed recordkeeping and reporting requirements to enable the public and permitting authorities to verify the accuracy of a source's projections of *de minimis* increases at Step 1's "significance" inquiry. The regulations imposed those requirements only where a source determined that a project would not produce a significant increase triggering New Source Review, yet

believed there was a "reasonable possibility" of such an increase. *New York,* 413 F.3d at 33. For such "reasonable possibility" projects, EPA's regulations required the plant-owner to: maintain records describing their project and the basis of their no-increase determination; track emissions from the units involved in the project; and report any significant increases to permitting authorities. *Id.* at 33-34 (citing 40 C.F.R. § 52.21(r)(6)(iii)). But where the owner concluded that no such possibility existed, the regulations required no recordkeeping or reporting. *Id.*

This Court remanded those provisions because they created "no means of discovering whether" a source-owner's determination that no significant increase would occur "was indeed 'reasonable.'" *Id.* at 35. EPA responded by defining "reasonable possibility" projects as those expected to increase emissions by 50% or more of the applicable significance threshold. 72 Fed. Reg. 72,607, 72,610 (Dec. 21, 2007).

### 4. EPA's Proposed "Project Netting" Regulations

In 2006, EPA proposed for the first time to allow "project netting"—that is, counting "both increases *and decreases*" on a non-source-wide basis at the initial "Step 1 of the NSR applicability test." 71 Fed. Reg.

54,235, 54,248-49 (Sept. 14, 2006) (emphasis added). EPA recognized that its existing regulations required an "initial inquiry" that assessed only "the emissions *increase* from the particular emissions units that are 'changed' or added and any other emissions increases resulting from the proposed … change," to determine whether the increase was significant. *Id.* at 54,248.

"Project netting" would, EPA stated, allow plant-owners to avoid New Source Review at that threshold step by looking at increases *and decreases* at only "the individual units involved in the project," rather than "netting on a source-wide basis (*i.e.*, in Step 2 of the NSR test)." *Id.* The proposal distinguished such "project netting" from the "source-wide netting" or "contemporaneous netting" permitted by EPA's existing regulations. *Id.* Commenters opposing the proposal (including some petitioners here) argued that project netting contradicted the statute and *Alabama Power* by allowing sources to selectively offset increases and decreases within a source, and to thereby significantly increase source-wide emissions without complying with New Source Review. JA___ (EPA-HQ-OAR-2018-0048-0079 Att. 1).

EPA did not finalize its project netting regulation. 74 Fed. Reg. 2,376, 2,381 (Jan. 15, 2009). The Agency did, however, address the possibility that sources could "circumvent the purpose of the NSR program" by separately evaluating multiple actions taken together. *Id.* at 2,377. EPA therefore articulated standards addressing when "multiple, nominally-separate activities that are sufficiently interrelated should be grouped together and considered a single project for the purpose of Step 1 of the NSR applicability test" (what EPA called "project aggregation"). *Id.*

EPA subsequently confirmed that its extant regulations did not permit, and that its regulations had never permitted, sources to include "emissions increases and *decreases* … resulting from a *project,*" at "Step 1 of the NSR applicability analysis." JA __, __ (Finazzo Memo 1, 3) (emphasis added). EPA explained that its 2002 regulations retained "the historic two step NSR applicability test," under which "the first step would involve totaling only the *emissions increases* at units affected by the project," while "the second [source-wide] step would allow for *both* emissions increases and *decreases* to be considered," if they were "contemporaneous and creditable." JA___ (*Id.* at 2-3)

(emphasis added). And it noted that when EPA declined to finalize the project netting regulation it had clarified that "project netting is not permissible." JA___ (*Id.* at 4-5) (source "may consider only emissions increases in Step 1 of the NSR applicability"). That aligned with EPA's prior "determinations" in which it had "stated that only the increases resulting from the project are considered in determining whether a significant emissions increase has occurred in Step 1." 71 Fed. Reg. at 54,248.

### 5. *Netting Before Project Accounting: Safeguards Preventing Pollution Increases from Escaping New Source Review*

EPA's interpretation of a "modification," between *Alabama Power* and the actions under review, thus contained three central safeguards ensuring that sources could not conduct changes increasing their pollution without complying with New Source review: *contemporaneity*, *enforceability*, and *source-wide* scope.

For example: If a plant added a new boiler that would produce 50 tons of sulfur dioxide per year, that change would result in a "significant increase" (Step 1) because it exceeded EPA's 40-ton *de minimis* threshold. 40 C.F.R. § 52.21(b)(2)(iv)(A), (b)(23). The plant could avoid New Source Review only if, under Step 2, prior activities at

the source produced an offsetting decrease of more than ten tons in its projected emissions. *Id.* § 52.21(b)(3). Any such offsetting decreases needed to be *contemporaneous*—they had to occur before any increase from the new boiler, and within the previous five years. *Id.* § 52.21(b)(3)(ii). They also needed to be "creditable"—so "*enforceable* as a practical matter." *Id.* § 52.21(b)(3)(vi) (emphasis added).

And the source had to account for all *source-wide* "increases" as well as "decreases." *Id.* § 52.21(b)(3)(i)(B). If the plant-owner had removed one boiler that decreased emissions by 15 tons, it could not ignore (say) a simultaneously added production line producing 30 tons of pollution; the net emissions change would be 65 tons (an increase of 50 tons for the new boiler, minus 15 tons for removing the old boiler *but* plus 30 tons from the new line), and the source would be required to comply with New Source Review.

### C. Actions Under Review: EPA's Adoption of Project Netting as "Project Emissions Accounting"

#### 1. The Pruitt Memo and Project Accounting Rule

In 2018, amidst concerted industry lobbying and the first Trump Presidency's deregulatory push, then-Administrator Scott Pruitt published a memorandum adopting the "project"-based netting EPA

had proposed but not promulgated in 2006. JA___ (EPA-HQ-OAR-2018-0048-0008 ("Pruitt Memo") at 1-2). EPA then codified that Memorandum in a final rule. 85 Fed. Reg. at 74,893 (the "Project Accounting Rule").

In those actions, EPA noted the Clean Air Act's definition of "modification," 85 Fed. Reg. at 74,894, and that "Congress intended to apply NSR *to changes that increase actual emissions*," such that "there must be a causal link between the physical or operational change … and any change in emissions that may ensue." JA__, ___ (Pruitt Memo 3, 6). But the Agency did not explain why those statutory terms authorized project netting, or why they justified a change from the Agency's longstanding insistence on source-wide netting. EPA did, however, rename "project netting" to "project emissions accounting." JA___ (Pruitt Memo 2).

EPA allowed project netting (or "project accounting") by re-interpreting two extra-statutory terms the agency had added to its regulations in 2002—"project" and "sum of the difference" (even though the 2002 rule-making did not suggest that those terms substantively changed EPA's methodology). JA__-__ (Pruitt Memo 3-5); 85 Fed. Reg.

at 74,893. EPA's regulations defining when a "project" produces a

"significant emissions increase" at Step 1 state:

> A significant emissions increase … is projected to occur if the *sum of the difference* between the projected actual emissions … and the baseline actual emissions … for each existing emissions unit, equals or exceeds the significant amount for that pollutant.

40 C.F.R. § 52.21(a)(2)(iv)(c) (defining test for existing emissions units)

(emphasis added); *see* 40 C.F.R. § 52.21(a)(2)(iv)(d) (defining test for

new emissions units as "the sum of the difference" between the units'

"potential to emit" and "baseline actual emissions").[6]

EPA acknowledged that those terms were meant only to determine

whether an "increase is 'significant,'" *i.e.* "greater than a *de minimis*

amount." JA __ (Pruitt Memo 3). But EPA homed in on "the phrase 'sum

of the difference.'" JA___ (*Id.* at 6). It asserted that a "'difference … may

be either a positive number (representing a projected increase) or a

negative number (representing a projected decrease)." *Id.* EPA therefore

---

[6] While these tests differ—with new units' future emissions being measured according to their potential, rather than projected actual, emissions, *see generally New York,* 413 F.3d at 15-16—those differences are immaterial here.

declared that Step 1 included both increases and offsetting decreases. *Id.*

On that basis EPA allowed sources to offset increases resulting from a "project"—a collection of activities within the source—with decreases resulting from that project at Step 1, thereby demonstrating that no "significant emissions increase" had occurred. *Id.* Such a source would avoid New Source Review *without* proceeding to Step 2 to assess whether a "significant net emissions increase" had occurred based on contemporaneous changes at the source as a whole. *Id.* at 5. "Project accounting" thus allowed a plant-owner to selectively aggregate "increases and decreases from the individual emissions units" that it deemed "part of the project," without any source-wide assessment. 85 Fed. Reg. at 74,893 n.27. EPA amended its regulations accordingly, defining "sum of the differences" to include "both increases and decreases." *Id.* at 74,893-94, 74,909.[7]

---

[7] EPA also changed those portions of its regulations that referred to the "sum of the increases" to "sum of the difference," recognizing that they were in tension with its new reading of its regulations. 85 Fed. Reg. at 74,893.

EPA further determined that emissions decreases assessed for the "project" need not be contemporaneous or enforceable. JA__ (Pruitt Memo 7-8); 85 Fed. Reg. at 74,893 n.25 (distinguishing "contemporaneous" netting), 74,901 (decreases need not be enforceable). EPA's regulations impose those conditions only on decreases considered at Step 2, in determining whether a proposed change will cause a "significant net emissions increase"—which, until the Pruitt Memo and Project Accounting Regulation, was the only step at which decreases were considered. 40 C.F.R. § 52.21(b)(2)(i). Because the regulations still make no mention of "decreases" in Step 1—which describes only a "significant emissions *increase*"—they contain no parallel conditions for the offsetting decreases now inserted into the Step 1 assessment via project accounting. *Id.* § 52.21(b)(40) (emphasis added).

EPA continued to allow "contemporaneous netting," at "Step 2"— that is, if a project produced an increase, a source could still avoid NSR by "adding the emissions increase from the project … to all *other* increases and decreases in actual emissions at the major stationary source that are contemporaneous with the project and otherwise

creditable." 85 Fed. Reg. at 74,893, 74,898 ("Step 2 contemporaneous netting is a distinct idea" from "project" netting).

EPA stated that "the source itself is responsible for defining the scope of its own 'project'"—that is, the portion of the plant at which increases and decreases should be counted—and acknowledged the resulting possibility that a source might "circumvent NSR through some wholly artificial grouping of activities." JA___ (Pruitt Memo 8); 85 Fed. Reg. at 74,900 (discussing circumvention concerns). EPA claimed that a test it had devised in an earlier "Project Aggregation Action"—defining a project as a collection of "substantially related" activities—could prevent such circumvention. 85 Fed. Reg. at 74,900; *see* 83 Fed. Reg. 57,324, 57,326 (Nov. 15, 2018). "Substantially related" activities are those with "an apparent technical or economical interconnection." 85 Fed. Reg. at 74,900. The test includes "a rebuttable presumption that project activities that occur outside a 3-year period are not related and should not be grouped into one project." *Id.* Absent application of that "substantially related" test, EPA recognized "the proposed rule change" could allow

sources to "avoid NSR" by including "unrelated emission decreases as part of the project under consideration." *Id.* at 74,898.

But EPA did not include the "substantially related" test in its regulations. *Id.* at 74,908. Nor did EPA require states to apply that test when conducting project accounting. *Id.* at 74,895 n. 57. EPA just characterized the test as one that "may assist sources" in defining a project. *Id.* at 74,895. Neither did the Project Aggregation Action in which EPA originally devised the "substantially related" test require its application; that Action merely "encourage[d] state and local air agencies to follow" EPA's interpretation. 83 Fed. Reg. at 57,228-29.

EPA responded to comments questioning the consistency of those rules with the statutory text with only the following:

> [T]he question of how to determine whether a physical change or change in method of operation "increases" emissions is ambiguous. Accordingly, because the statutory text does not itself dictate how to determine whether a physical change or change in the method of operation increases emissions, under principles established by the Supreme Court, the 'EPA has the authority to choose an interpretation' of the term 'increases' in 'administering the NSR program and filling in the gaps left by Congress.' And in choosing an interpretation of the term 'increases' … EPA is

entitled to balance environmental concerns with economic and administrative concerns ….

85 Fed. Reg. at 74,897 (citing *New York,* 443 F.3d at 22 and *Chevron v. NRDC*, 467 U.S, 837, 843 (1984)). EPA also disavowed any basis for its rule in EPA's "inherent *de minimis* exemption authority." 85 Fed. Reg. at 74,899.

### 2. EPA's Reconsideration Proposal and Reopening of Project Accounting.

Recognizing that petitioners had raised significant concerns as to the Project Accounting Rule's compatibility with the New Source Review program, EPA voluntarily began a rulemaking reconsidering that Rule. 89 Fed. Reg. 36,870, 36,873 (May 3, 2024).[8] In 2024 EPA published a proposed rule (the "Reconsideration Proposal"). In that Proposal, *inter alia,* the Agency recognized that it had "predicated finalization of the [Project Accounting Rule] on the basis that the 2018 Project Aggregation Final Action"—the substantially-related test—"or some analogous definition of project, would be applied by permitting authorities to prevent circumvention of the NSR program requirements"

---

[8] EPA found no basis for mandatory reconsideration. 86 Fed. Reg. at 57,585. Petitioners challenged that decision, but EPA's voluntary reconsideration renders that challenge irrelevant.

through project accounting, "yet did not establish such a requirement in that rule." *Id.* at 36,878-79. EPA therefore proposed to add a definition of "project" to its regulations imposing the "substantially related" test. *Id.*

EPA further recognized that by authorizing netting at Step 1, it was allowing sources to bypass the regulations' requirement that only "contemporaneous" decreases be used to offset emissions increases at a source. *Id.* at 36,879 (concluding that decreases used in project accounting have no "criteria" creating "a specific temporal component"). Those bypassed requirements included the condition that the decrease occur *prior* to the emissions increase. 40 C.F.R. § 52.21(b)(3)(ii). The Agency observed that it had "become aware of several multi-year expansion projects that span more than three years," and requested comment on whether any temporal restrictions on project netting were appropriate. 89 Fed. Reg. at 36,879.

The Agency also acknowledged the need for "a safeguard to ensure that emissions decreases" used during project netting "will occur and be maintained." *Id.* at 36,880. The recordkeeping and reporting requirements contained in its 2002 regulations were, EPA observed,

30

insufficient "to ensure that decreases" used during project netting "actually occur," or to determine whether aggregated activities were sufficiently related to be considered the same "project." *Id.* at 36,883. EPA therefore proposed amendments making decreases used for project accounting enforceable (as they are in contemporaneous netting). *Id.* at 36,881. And EPA proposed defining *all* projects using project accounting as posing a "reasonable possibility" of an increase (rather than only those projects with emissions at or above 50% of the significance threshold) to ensure that offsetting decreases would be confirmed via post-change recordkeeping. *Id.* at 36,883.

EPA also requested comment on whether it should "expressly disallow" project accounting "such that only emissions increases can be considered under the Step 1 significant emissions increase determination." *Id.* at 36,881. In response, the groups petitioning here pointed out that project accounting conflicted with the Act's definition of a modification as "any" physical or operational "change" that "increases the amount" of a source's emissions, and that Project Accounting Rule's ambiguity-based rationale contradicted the

Supreme Court's decision in *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369 (2024). JA\_\_\_, \_\_\_ (Pet. Comments Att. 1 at 24, 41).

EPA withdrew its proposal and terminated the rulemaking in July 2025, without adding to its statutory analysis or further amending its regulations. 90 Fed. Reg. at 34,207.

### D. Conclusion

EPA promulgated the first step of its New Source Review applicability analysis—whether an increase in emissions was large enough to be "significant"—only to exclude *de minimis* changes. 45 Fed. Reg. at 52,698. The second "contemporaneous netting" step was, before the Pruitt Memo and Project Accounting Rule, the sole means by which EPA assessed whether those emissions increases were offset by other emissions decreases, such that the "change" did not "increase[]" the source's emissions. *Alabama Power*, 636 F.2d at 401-02 (upholding EPA's regulations because they adopt plant-wide "bubble" to assess whether a change increases emissions).

EPA's project accounting actions reinterpret the words "project" and "sum of the difference"—extra-statutory terms—to transform that first step from a *de minimis* threshold into an independent, alternative

means of offsetting a significant emissions increase against decreases elsewhere at the plant. That transformation produces a netting regime unconstrained by the three central constraints of the prior regime: that offsetting decreases be *contemporaneous*, that they be *enforceable*, and that the netting analysis be *source-wide*. It thereby allows changes that produce significant real-world pollution increases to escape New Source Review.

Project accounting allows plants to "net" emissions increases against decreases that are not *contemporaneous* or *enforceable* because EPA's regulations require contemporaneity and enforceability only for "contemporaneous" netting—Step 2. 40 C.F.R. § 52.21(b)(3)(ii)-(vi); 85 Fed. Reg. at 74,892; 89 Fed. Reg. at 36,880. Project netting occurs at Step 1, which contains no such requirements. 40 C.F.R. § 52.21(b)(3)(i). Indeed, a plant may rely on emissions decreases that *follow* a significant increase by years—exposing the nearby public to "increase[d] pollution," without New Source Review's required controls or assurance that air quality standards will be maintained. *Alabama Power*, 636 F.2d at 401.

And only Step 2 requires a *source-wide* assessment of both decreases and contemporaneous "increases." 40 C.F.R. § 52.21(b)(3)(i). Project accounting allows a source-operator to instead ignore contemporaneous activities that increase the source's actual emissions. A source may pair a 50 ton-per-year increase in sulfur dioxide from a new boiler with a 15-ton decrease from removing an old boiler into a "project" with a net increase of 35 tons, below EPA's 40-ton threshold for a "significant" increase at Step 1—*even if* it is simultaneously conducting other activities increasing its emissions by 30 tons. The source would thus avoid New Source Review notwithstanding the resulting significant (65-ton) increase in the plant's actual, real-world pollution.

## SUMMARY

EPA's adoption of project accounting is unlawful. As an initial matter, the sole statutory authority EPA provides for its rule is discretion created by statutory ambiguity alone. 85 Fed. Reg. at 74,894. No such authority exists. *Loper Bright,* 603 U.S. at 400-01. Second, EPA has adopted two inconsistent interpretations of the term "modification"; as a result, EPA has equated a "change" with a "project" but—in violation of the text—simultaneously failed to define "any" such

emissions-increasing project as a "modification." 42 U.S.C. § 7411(a)(4) (a modification includes "any" change increasing emissions). And third, by permitting sources to conduct activities producing years-long significant emissions increases without New Source Review, project accounting violates the plain text of the Clean Air Act, which makes *any* change producing an emissions increase a "modification" requiring review. *Id.*

EPA's actions adopting project accounting are also arbitrary and capricious. EPA has not explained how its recordkeeping requirements permit enforcement of New Source Review. And EPA premised its adoption of project accounting on compliance with a "substantially related" test, but failed to require application of that test.

## STANDING

Petitioners' members and their families live, work, and recreate in areas where there is substantially likely to be additional pollution due to EPA's actions. Sources near these members have used project accounting to avoid New Source Review for planned changes, thereby circumventing substantive and procedural protections "that Congress

35

deemed necessary" to protect public health and welfare. *Cal. Cmtys. Against Toxics v. EPA*, 928 F.3d 1041, 1048-49 (D.C. Cir. 2019).

Many members live and recreate in areas where project accounting is being used to construct new methane-gas power plants without undergoing major New Source Review, meaning that these plants, which could operate for the next half century or longer, do not need to reduce emissions to the level achievable through use of up-to-date controls, *see* 42 U.S.C. §§ 7475(a)(4), 7503(a)(2), and do not need to conduct rigorous analysis of emissions impacts on air quality, *see id.* §§ 7475(a)(3), (a)(6), (a)(7), (e); 7503(a)(1), (5). *See* Decl. of Aurora Barone ¶ 23; Decl. of Charles Crow ¶ 3; Decl. of Elizabeth Griffith ¶ 3; Decl. of Gary Masterson ¶ 3; Decl. of Katie McClintock ¶¶ 4–6, 11–14, 19–21, 25–27, 64–66; Decl. of Ashley Soliman ¶ 14; Decl. of Elaine M. Steele ¶ 3; Decl. of Andrew Taylor ¶¶ 4, 7, 25; Decl. of Joy Zedler ¶¶ 9, 18.

Other members live near industrial facilities like refineries and manufacturing plants that used project accounting to avoid New Source Review for plant expansions and upgrades. Barone Decl. ¶ 23; Decl. of Stephanie Coates ¶ 9; Decl. of Vicki Hawarden ¶ 4; Decl. of Grace Lewis ¶ 22; Decl. of Martha MacArthur ¶ 10; McClintock Decl. ¶¶ 35–37, 40–

36

43, 46–47, 49–51, 53–56, 59–61, 69–71; Decl. of Cynthia Sanford ¶ 8; Soliman Decl. ¶ 13; Taylor Decl. ¶¶ 4–5; Decl. of Gina Trujillo ¶¶ 9–10.

Project accounting allowed these sources to bypass review of other contemporaneous emissions changes, obscuring whether "industrial changes might increase pollution in an area," *Alabama Power Co.*, 636 F.2d at 401, and shielding potentially significant emissions increases from pollution control requirements. In addition, many of their permits do not require offsetting emission decreases to be enforceable (as required prior to project accounting) and/or allow changes that increase emissions before the offsetting decreases occur (prohibited prior to project accounting), exposing Petitioners' members to elevated pollution levels in the interim. McClintock Decl. ¶¶ 7–8, 15, 18, 22, 28–29, 34, 38, 44, 67. If these projects were subject to major New Source Review, they would be subject to permanent emission limits reflecting use of the best available pollution controls, exposing Petitioners' members to less pollution over the long-term. McClintock Decl. ¶¶ 10, 17, 24, 30, 39, 45, 48, 52, 58, 63, 68, 73.

In addition to facing greater exposure to health-harming pollution, Petitioners' members' concerns that nearby facilities are evading Clean

Air Act protections diminishes their enjoyment of outdoor activities like hiking, biking, and gardening. Arnett Decl. ¶¶ 5–7, 14, 22, 24, 30; Coates Decl. ¶¶ 13–14; Crow Decl. ¶¶ 7–10, 17; Griffith Decl. ¶¶ 4–11, 18–19; Hawarden Decl. ¶¶ 5–7, 10, 15; MacArthur Decl. ¶¶ 4, 7, 11, 13; Masterson Decl. ¶¶ 5–6, 21–22; Sanford Decl. ¶¶ 4, 6–7, 10–11; Steele Decl. ¶¶ 5, 12–13; Taylor Decl. ¶¶ 6–8, 24, 26, 31; Zedler Decl. ¶¶ 4–6, 12, 21, 29. Some worry additional pollution will exacerbate existing health conditions or worsen already poor air quality where they live— precisely the types of harms Congress intended New Source Review to mitigate. Coates Decl. ¶¶ 9–12, 14; Crow Decl. ¶¶ 14–17; Griffith Decl. ¶¶ 10, 15–19; Hawarden Decl. ¶¶ 7, 9–10, 13, 15; MacArthur Decl. ¶¶ 5, 9, 11, 13; Masterson Decl. ¶¶ 9, 13, 15, 18, 20–23; Sanford Decl. ¶¶ 5, 10–11; Steele Decl. ¶ 7 ,12; Taylor Decl. ¶¶ 9, 12, 18, 24,  26; Zedler Decl. ¶¶ 7–12, 21, 23, 25–26, 28, 30. Some are also upset about impacts to family members (Arnett Decl. ¶¶ 26–28; Coates Decl. ¶¶ 13–14; Griffith Decl. ¶¶ 18–20; Hawarden Decl. ¶¶ 8, 15; MacArthur Decl. ¶¶ 6–7, 11, 13; Masterson Decl. ¶¶ 2, 6, 14, 21–23; Taylor Decl. ¶¶ 6–8, 27–30; Zedler Decl. ¶ 31) as well as impacts to plant life and wildlife (Arnett Decl. ¶ 29; Griffith Decl. ¶¶ 6, 21; Hawarden Decl. ¶ 3; Zedler

38

Decl. ¶¶ 24–25). *See Cal. Cmtys.*, 928 F.3d at 1048-49; *Earthworks v. DOI*, 105 F.4th 449, 455-56 (D.C. Cir. 2024). Facilities near Petitioners' members, many in industries that lobbied for project accounting, *see* McClintock Decl. ¶¶ 74–86, will likely use it for future projects, causing continuing risk of harm. Taylor Decl. ¶¶ 22–23; Zedler Decl. ¶¶ 7–8, 10–11, 20, 27.

Project accounting also allows facilities to evade procedural requirements including a public hearing on the proposed permit and opportunity for written and oral comments. 42 U.S.C. § 7475(a)(2); Arnett Decl. ¶¶ 10–11; Barone Decl. ¶ 15; Coates Decl. ¶¶ 11–12; Lewis Decl. ¶¶ 10–11, 24; Taylor Decl. ¶¶ 11, 33; This denies Petitioners' members and Petitioners opportunity to raise and have addressed concerns about pollution increases that impact members' health and aesthetic and recreational interests. *Wildearth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013).

Finally, project accounting causes Petitioners organizational and informational harms by excusing sources from Clean Air Act requirements to conduct air quality analysis and monitoring and make the results publicly available. 42 U.S.C. §§ 7475(a)(2), (a)(3), (a)(6),

(a)(7), (e); 7503(a)(1)(A); *Nat'l Sec. Archive v. CIA*, 104 F.4th 267, 271-72 (D.C. Cir. 2024). This reduces Petitioners' ability to fulfill their organizational mission by disseminating accurate information about the air quality impacts of facility modifications and requires greater organizational resources to be diverted to collecting air pollution data. Barone Decl. ¶¶ 15–18; Coates Decl. ¶¶ 3–8; Lewis Decl. ¶¶ 9, 11–18, 34; *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093-97 (D.C. Cir. 2015).

The requested relief would redress these injuries by establishing a basis for permitting authorities to reopen and revisit unlawfully granted permits, *see, e.g.,* 40 C.F.R. § 70.7(f), (g), and preventing future issuance of such permits. Source owners and operators who nonetheless construct without a New Source Review permit would be subject to a citizen suit.  42 U.S.C. § 7604(a)(3).

### STANDARD OF REVIEW

The Clean Air Act requires that courts determine whether EPA's actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required

by law." 42 U.S.C. § 7607(d)(9). The Act demands that EPA provide "the

major legal interpretations" underlying its rules, 42 § U.S.C.

7607(d)(3)(C). To survive review, those interpretations must articulate

"the best"—not just a "permissible"—understanding of the statute.

*Loper Bright,* 603 U.S. at 400-01. Where "the best reading of the statute

is that it delegates discretionary authority to the agency," reviewing

courts "fix[] the boundaries of [the] delegated authority" and ensure

"the agency has engaged in 'reasoned decisionmaking' within those

boundaries." *Id.* at 371 (citation omitted).

**ARGUMENT**

## I. EPA Claims No Valid Statutory Authority for Project Accounting, Because Ambiguity Is Not a Grant of Agency Authority.

EPA's asserts only the following statutory rationale for the Project

Accounting Rule:

> [T]he question of how to determine whether a physical change or change in the method of operation 'increases' emissions [under 42 U.S.C. § 7411(a)(4)] is ambiguous. Accordingly, … 'EPA has the authority to choose an interpretation' of the term 'increases' in 'administering the NSR program and filling in the gaps left by Congress.' …

85 Fed. Reg. at 74,894 (citations omitted). *See* 84 Fed. Reg. 39,244,

39,249 (Aug. 9, 2019) (proposal); JA___ (Pruitt Memo 6) (interpreting

41

regulations, but not statute); JA\_\_\_ (EPA-HQ-OAR-2018-0048-0099

("Comments Response") at 30) (invoking "*Chevron* deference").

That rationale cannot support EPA's actions. "'[A]n ambiguity is simply not a delegation of law-interpreting power,'" and does not "reflect a congressional intent that an agency … resolve the resulting interpretive question." *Loper Bright*, 603 U.S. at 399. EPA thus claims "authority" that does not exist: a power to "balance environmental concerns with economic and administrative concerns" as the Agency sees fit, arising solely out of purported "ambiguity." 85 Fed. Reg. at 74,894. EPA has offered no other grant of statutory authority for its action.[9] *Loper Bright*, 603 U.S. at 400 (demanding

---

[9] The Pruitt Memo passingly refers to Congress' intent to "apply NSR to *changes that increase actual emissions*." JA\_\_\_ (Pruitt Memo 6). But congressional intent alone does not create statutory authority; and project accounting allows changes that increase emissions without NSR. EPA also notes a "modification" under the Act requires "a causal link between the physical or operational change … and any change in emissions that may ensue." *Id.* Even if that is correct: *some* causal link does not explain EPA's decision to choose *this* (project-based) link. EPA's Project Accounting Rule also recites that project accounting "is the best reading of CAA section 111(a)(4)." 85 Fed. Reg. at 74,899. In support EPA offers only its view that project accounting "will ensure that projects" that do not significantly increase emissions "will not be subject to" NSR. *Id.* That is wholly circular. It simply *describes* project

"best" interpretation of the statute using "all relevant interpretive tools").

That leaves no basis on which this Court could uphold project accounting. The Clean Air Act obligates EPA to provide "the major legal interpretations" underlying its rules. 42 U.S.C. § 7607(d)(3)(C), (6)(A).[10] And it is "'a simple but fundamental rule of administrative law' that reviewing courts 'must judge the propriety … by the grounds invoked by the agency.'" *Calcutt v. FDIC,* 598 U.S. 623, 624 (2023) (quoting *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947). *See Est. of Isigna v. Comm'r*, 149 F.4th 709, 718 (D.C. Cir. 2025) (a court commits a "straightforward *Chenery* violation" where it addresses legal rationale that agency did not provide.). Petitioners repeatedly requested clarification of EPA's statutory rationale—including after *Loper Bright* confirmed that EPA could not rely on ambiguity. JA__ (Pet. Comments 41); JA___ (EPA-HQ-OAR-2018-0048-0079 at 24-25).

---

accounting, rather than illuminating its relationship to the best reading of the statute.

[10] That ensures that the public has an opportunity to present objections to the Agency's interpretations to the Agency, a prerequisite to judicial review of those interpretations. 42 U.S.C. § 7607(d)(7)(B).

Yet EPA declined to provide any such clarification, further violating its obligation to respond to comments. *Sierra Club v. EPA,* 863 F.3d 834, 839 (D.C. Cir. 2017).

EPA's failure to ground project accounting in the Act results from a "familiar phenomenon": The Agency has ignored "the statutory text—'the authoritative source of the law'"—in favor of "its own constructions of (its own constructions of)" the Act. *Stern Produce Co. v. NLRB,* 97 F.4th 1, 10 (D.C. Cir. 2024) (citation omitted). In 1980 EPA invoked *de minimis* authority to insert a threshold step into its regulations governing an "increase" in emissions—asking whether the increase was "significant." 45 Fed. Reg. at 52,705-06 (explaining adoption of initial "significant increase" step). In 2002 it inserted the extra-statutory terms "project" and "sum of the difference" into its regulations describing that first "significant net emissions increase" step. 67 Fed. Reg. at 80,287-89.

Now EPA purports to reinterpret its own elaborations upon the text to permit plants to offset emissions increases against decreases that are not contemporaneous or enforceable, and without accounting for source-wide emissions—even while disavowing the *de minimis* authority that

its first "significant emissions increase" step purportedly embodies. JA__ (Pruitt Memo 2) (project accounting "captures what Step 1 … is really all about"); 85 Fed. Reg. at 74,899 ("The clarification reflected in this rule is not based on inherent *de minimis* exemption authority"). *But see* 61 Fed. Reg. at 38,253 ("[T]he first step" of applicability determination determines only "whether a physical or operational change will occur," and "exclud[es] all changes that do not result in an emissions increase above [*de minimis*] 'significance' levels," while the "second step" defines whether the change "will result in an emissions increase.").

Even if each link in that chain of interpretations appeared reasonable "in relation to that which preceded it" (dubious), the "end result" is one that has "drift[ed] 'further and further from'" the statute and "would never have been seriously considered in the first instance." *Stern Produce*, 97 F.4th at 11 (citation omitted). EPA has provided *no* valid statutory authority for that result. And, as set forth below, no such authority exists.

## II. Allowing Project Accounting Alongside Contemporaneous Netting Produces an Incoherent Interpretation of "Modification."

EPA could not provide a coherent interpretation of the operative term "modification" to support its adoption of project accounting. 42 U.S.C. § 7411(a)(4). By allowing both project accounting and "contemporaneous" netting, EPA is implementing two inconsistent understandings of the same statutory phrase: "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source." *Id.* That violates the "fundamental rule[]" that "a single use of a statutory phrase must have a fixed meaning." *Cochise Consultancy, Inc. v. United States*, 587 U.S. 262, 268-69 (2019); *accord Alabama Power*, 636 F.3d at 401. And it reads "any" out of the statute. *New York v. EPA*, 443 F.3d 880, 885 (2006) (*New York II*) ("Because Congress used the word 'any,' EPA must apply NSR whenever a source conducts an emission-increasing activity that fits within" the "ordinary meaning[]" of a "change.").

*Alabama Power* recognized "two possible ways to construe the term 'increases,'" 636 F.2d at 400-01—the term that EPA purports to be interpreting here, 85 Fed. Reg. at 74,894. The first is source-wide: "[O]ne can look at any change proposed for a *plant*, and decide whether

the net effect of all the steps involved in that change is to increase" emissions. *Alabama Power,* 636 F.2d at 401 (emphasis added). EPA adopted that source-wide interpretation through what it now calls "contemporaneous" (or Step 2) netting: measuring an increase as "the positive sum of any increase in 'actual emissions' from a particular physical or operational change at a source *and* any other increases and decreases in 'actual emissions' that are contemporaneous with the particular change and otherwise creditable." 45 Fed. Reg. at 52,698. Contemporaneous netting, in other words, asserts that a "change" "increases" emission when all *contemporaneous* changes at the *entire source* increase emissions. *See New York,* 413 F.3d at 36 ("EPA has the authority to define 'increases' in terms of source wide emissions."); *Alabama Power,* 636 F.2d at 402 (noting that EPA can only consider "contemporaneous" changes).

Project accounting eschews that source-wide approach in favor of the "second" approach noted in *Alabama Power*: it "inspect[s] the individual units of [the] plant, which are affected by an operational change"—what EPA here calls the "effect of the project alone"—in order to "determine whether any of the units will consequently emit more of a pollutant." *Id.*

47

at 401; 85 Fed Reg at 74,892-93 & n.27 (project accounting counts only "increases and decreases from the individual emissions units that are part of the project").[11] Project accounting allows plant-owners to assess increases and decreases across a subset of units within the source—whatever the owner deems related to the "project"—*without* regard to source-wide contemporaneous emissions. 85 Fed. Reg. at 74,899-900 (explaining that project netting offsets only "increases and decreases from the *same* project," not source-wide, and that plant-owners retain "discretion" to assemble a project from "activities" at "multiple emissions units" within a source).

EPA adopts that approach—focusing on just the units affected by the project—even while retaining the source-wide, contemporaneous "bubble" approved by *Alabama Power. Id.* at 74,892. *See also Alabama Power,* 636 F.2d at 402 (affirming EPA's regulation because it "allows

---

[11] *Alabama Power* approved a source-wide interpretation that subjected fewer, rather than more, changes to NSR. 636 F.2d at 401. But an interpretation's permissive and restrictive consequences are equally binding; that here EPA's non-source-wide approach weakens NSR makes no difference. *U.S. Sugar v. EPA,* 830 F.3d 579, 631 (D.C. Cir. 2016) (EPA must "take the bitter with the sweet.").

offsets within a 'source'" as a whole but does not "allow offsets within any 'combination of facilities'" inside the source).

The Clean Air Act (like any statute) does not permit EPA to implement "two different definitions of 'modification.'" *Id.* at 403; *Cochise Consulting,* 587 U.S. at 268-69. Yet EPA here has done just that. Even if EPA could define a "change" that "increases" emissions on a project-, rather than source-wide, basis, it cannot simultaneously adopt *both* definitions, giving plant-owners the option of picking whichever interpretation enables them to avoid New Source Review. 85 Fed. Reg. at 74,899.

Moreover, EPA's divergent interpretations excises "any" from the text defining a modification. 42 U.S.C. § 7411(a)(4). Under project accounting, the "change" whose "increases" are measured is a "project"—a collection of (potentially offsetting) activities within the source. 85 Fed. Reg. at 74,892-93 & n.27 (project accounting includes only increases from "the individual emissions units that are part of the project"); 40 C.F.R. § 52.21(b)(52) (defining "project" as "a physical change in, or change in the method of operation of" a source). But if that is EPA's definition of a "change," the statute requires that "*any*" such

change that increases emissions be a modification triggering New Source Review. 42 U.S.C. § 7411(a)(4) ("The term 'modification' means *any* … change" in "a stationary source which increases" emissions).

Yet EPA's interpretation does not make "any" emissions-increasing project a modification. Because EPA has retained *Alabama Power*'s "plantwide bubble," 61 Fed. Reg. at 38,253, a "project" that produces a significant increase—one above EPA's *de minimis* thresholds—need *not* trigger New Source Review. According to EPA a source may still look to *unrelated* changes elsewhere at the source—"other projects"—and if those changes produce an offsetting decrease no modification has occurred.[12] 85 Fed. Reg. at 74,892-93 (if a "project" produces a significant increase, source may still "perform the step 2 contemporaneous netting analysis"), 74,898-99 (contemporaneous netting allows sources to "avoid NSR" based on "unrelated changes" at

---

[12] This second step—what EPA calls "contemporaneous netting"—was based on *Alabama Power*'s understanding of a modification as including all "all the steps involved" in a single "change."626 F.2d at 401; 45 Fed. Reg. at 52,698-99. To allow project accounting, EPA has re-characterized contemporaneous netting (Step 2) as allowing sources to offset wholly distinct and unrelated changes. 85 Fed. Reg. at 74,899 (contemporaneous netting "account[s] for emissions decreases from *another* project"), 74,900 n.85 (a "project" is "the physical change or change in method of operation under review").

facility"); JA\_\_\_ (Pruitt Memo 3-4) (a modification occurs if, and only if, source-wide contemporaneous emissions rise).

That violates the statutory text. This Court has established that because "the word 'any' … has an expansive meaning," "EPA must apply NSR whenever a source conducts an emission-increasing activity that fits" within the "ordinary meaning[]" of physical or operational "change." *New York II,* 443 F.3d at 885. If such a "change" is a "project"—a collection of related activities within some portion of the source—then *any* emissions-increasing project must be a modification requiring New Source review. JA\_\_ (Comments Response at 19) (claiming that "project" and "change" are "synonymous").

Instead, EPA has left plant-owners the option of invoking a separate definition of "increases" based on "source-wide emissions," *New York,* 413 F.3d at 47. 85 Fed. Reg. 74,899. That alternative interpretation allows some changes that significantly increase emissions to evade review based on offsetting reductions from other, "unrelated changes" at the source. 85 Fed. Reg. at 74,898; JA\_\_\_ (Comments Response at 77). *See id.* at 74,894 n.49 (emissions decreases "accounted for in Step 2" are "ones 'other' than those associated with the project"). EPA could not

square that result with the statutory text, even if it attempted to do so (which it has not).

## II. Project Accounting Unlawfully Excludes Changes Producing Emissions Increases from a "Modification" Requiring New Source Review.

### A. By Allowing a Source to Delay Emission Decreases for Years After a Change Causes a Significant Emissions Increase, Project Accounting Contradicts the Statutory Definition of "Modification."

By eliminating any requirement that an anticipated emission decrease from a change be achieved *before* any increase, project accounting allows a source to undertake a change producing years-long significant emissions increases without complying with New Source Review. That flatly contradicts any reasonable understanding of the statute, which defines a modification requiring review as "*any* physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source." 42 U.S.C. § 7411(a)(4) (emphasis added).

Before EPA's adoption of project accounting, an emissions decrease relied on by a source to avoid New Source Review could only be counted through Step 2 "contemporaneous" netting. Under the regulations governing Step 2, any such decrease had to be "contemporaneous" and

52

"creditable"—*i.e.*, the decrease had to occur "before" any increase and "enforceable … at and after the time that actual construction on the particular change begins." 40 C.F.R. § 52.21(b)(3)(i)(B), (ii)(B), (iv). Project accounting now allows sources to count project-related decreases at Step 1, which does not require that decreases be "contemporaneous" with the increases, or "enforceable." 85 Fed. Reg. at 74,892, 74,898 (distinguishing decreases considered at Step 1 as part of a "project" from decreases considered under Step 2 "contemporaneous" netting). Consequently, the regulations do not require that these decreases occur *before* the increases being offset. JA__, ___ (Comments Response at 22, 79) (acknowledging that contemporaneity and enforceability required "in Step 2 of the major modification applicability test" but not "Step 1," at which project-based accounting occurs); 85 Fed. Reg. at 74,893 n.25 (project accounting removes constraint that decreases occur "in the five-year period" preceding increase).

Project accounting thus allows a source to construct a new boiler adding hundreds of tons of pollution to the atmosphere based on the source's promise that it will at some future date remove an existing boiler of similar size—and, under EPA's construction of the statute, no

"modification" triggering New Source Review will occur. The "project" (adding the new boiler and removing the old one years later), under that construction, produces no "significant emissions increase." 40 C.F.R. § 52.21(b)(2)(iv)(B). Instead, the future reductions are folded into the "projected actual emissions" for the entire multi-unit project, and so long as emission decreases will *eventually* bring the total below EPA's significance thresholds the project is not a modification requiring New Source Review.[13] *Id.* § 52.21(b)(41) ("Projected actual emissions means the maximum annual rate, in tons per year … in any one of the 5 years … following the date the unit resumes regular operation *after the project*") (emphasis added). The result is a significant increase in source-wide emissions while the new and old boilers operate together,

---

[13] EPA cited comments on its Project Accounting Rule which described a similar project as an "example" of a project that could avoid NSR through project accounting. 85 Fed. Reg. at 74,895. That project would "[d]ouble electric generating capacity at facility through construction of new units," but also "retire 4 existing units" and "add [a] scrubber to existing unit." JA___ (EPA-HQ-OAR-2018-0048-0077 at 2). *See also* JA ___ (Comments Response at 45) ("EPA believes that many, if not most" decreases used in project accounting will result from "installation of controls or the removal of an emission unit."). *See also* JA__ (EPA-HQ-OAR-2022-0381-005 at 21-25) (providing further examples).

continuing until the source removes the existing units—a period that could last years.

EPA's exclusion of activities producing such years-long, non-*de-minimis* increases from a "modification" requiring New Source Review is incompatible with the statutory text. That text specifies that a "modification" encompasses (a) "any" "change" that (b) "increases the amount" of any pollutant "emitted by the source." 42 U.S.C. § 7411(a)(4). Such activities are, first, a "physical" or "operational" "change." *Id.* Congress' use of the word "any" in defining a "modification" extends the definition to all types of "changes." *New York II,* 443 F.3d at 888. EPA characterizes a "project" as grouping together multiple "activities," 85 Fed. Reg. at 74,900 n.85; but there is no meaningful reason why each of those activities—*e.g.*, adding wholly new boilers or process units—would fall outside the "ordinary meaning" of the word "change." *New York II*, 443 F.3d at 895, 890 (EPA "may not choose to exclude" any "'real-world, common-sense usage of the word 'change'" from its interpretation of a "modification"). *See* 85 Fed. Reg. at 74,893 (a project can "involve new, existing, or a combination of new and existing units"). Rather, the Agency describes the offsetting

"activities" making up projects as, themselves, "physical and operational changes." *E.g.,* JA___, ___ (Comments Response at 13, 42).

Such changes, second, "increase[] the amount" of pollution "emitted by [the] source." 42 U.S.C. § 7411(a)(4). *See New York II,* 443 F.3d at 890 ("[O]nly changes that increase emissions will trigger NSR"). EPA accepts that under project accounting, a change included as part of a "project" could cause a significant emissions increase when considered alone such that it could be subject to "preconstruction review." 84 Fed. Reg. at 39,249-50.

If the source delays achieving offsetting decreases until after a project activity causes a significant increase, the surrounding community will be burdened with additional pollution in the interim—a period that can last for three years or even longer. *See* 89 Fed. Reg. at 36,879 ("EPA has become aware of several multi-year expansion projects that span more than three years."). EPA does not, and could not, make any claim that those multi-year increases are sufficiently "trifling" to be disregarded as *de minimis, New York II,* 443 F.3d at 888 (noting EPA's "inherent power" to exempt "minuscule" increases) (citations omitted)). 85 Fed. Reg. at 74,899-900 (rule "is not based on

inherent *de minimis* exemption authority"). EPA has set *de minimis* significance levels in tons *per year* (generally at less than 40 tons per year). 40 C.F.R. § 52.21(b)(23)(i). *Multi*-year increases above those levels could not plausibly be characterized as so immaterial as to be *de minimis.*

Project accounting consequently interprets "modification" to exclude "changes" that produce years-long significant increases in the "amount" of "air pollutant[s] emitted by [the] source." 42 U.S.C. § 7411(a)(4). That violates "the plain language" of the Clean Air Act, which "indicates that Congress intended to apply NSR to changes that increase actual emissions." *New York*, 413 F.3d at 40. Consequently "[a]ny offset changes claimed by industry" to avoid New Source Review "*must* be substantially contemporaneous." *Alabama Power*, 636 F.2d at 402 (emphasis added) ("Congress wished to apply the permit process … where industrial changes might increase pollution in an area …"). That is especially so given Congress' repeated use of the "expansive" word "any"—encompassing "any" change, that increases the amount of "any" pollutant. *New York II*, 443 F.3d at 885. By discarding contemporaneity EPA is allowing changes producing significant pollution increases to

bypass New Source Review, in conflict with the text's command that any such change is a modification requiring such review. 42 U.S.C. § 7411(a)(4).

That textual conflict is underscored by the Act's structure and design. New Source Review ensures, *inter alia,* that new and modified do not cause or contribute to a violation of National Ambient Air Quality Standards (measured based on annual, 24-hour, or 3-hour-averaging period) or cause significant deterioration of air quality in areas meeting those standards. *Id.* §§ 7475(a)(3), 7503(a)(1). States are required to adopt implementation plans regulating "the modification" of stationary sources "as necessary to assure that national ambient air quality standards are achieved." *Id.* § 7410(a)(2)(C). Project accounting permits multi-year emissions increases—easily sufficient to produce such violations and deterioration—without any prophylactic review. That interpretation "would destabilize" that statutory scheme by preventing New Source Review from accomplishing its purpose of protecting air quality standards, further confirming its unlawfulness. *King v. Burwell,* 576 U.S. 473, 492 (2015).

*B. The "Substantially Related" Test Does Not Assure Contemporaneity, or Square Project Accounting with the Statute.*

EPA provided no explanation of its view that a change producing a significant emissions increase, followed by a decrease years later, is not a statutory "modification." *See* JA___, (Pet. Comments 7-11); 90 Fed. Reg. at 34,206 (withdrawing proposal without response). The Agency responded to comments noting its abandonment of contemporaneity only by asserting that the "substantially related" test borrowed from its Project Aggregation Action contains a "temporal component." 85 Fed. Reg. at 74,898. That test—which suggests "a rebuttable presumption that activities that occur outside a 3-year period are not related and should not be grouped into one project"—does not resolve the conflict between project accounting and the statute, for three reasons. *Id.* at 74,895.

First, the test does not require emission decreases to occur *prior to* any emission increases caused by a change (as they must be to be "contemporaneous," 40 C.F.R. § 52.21(b)(3)(ii)). It just asks whether the "activities" producing the increase and decrease "are undertaken three or more years apart." 85 Fed. Reg. at 74,900 (citation omitted). A decrease that follows a significant increase by 35 months meets that

standard, despite the intervening increases in actual emissions. Second, the test merely sets a presumption—which can be rebutted. *Id.*; JA__ (Comments Response at 66-67) ("[A]ctivities outside of [the] 3 year timeframe" may be "determined to be 'substantially related'" thereby "rebutting the presumption"). Indeed, EPA gives plant-owners "discretion" to exceed that three-year timeframe "based on their business needs." 85 Fed. Reg. at 74,900. The substantially related test thus permits changes that cause significant increases that last *more* than three years—yet are not "modifications" triggering review. And third, as explained below, EPA does not require application of the substantially related test; it has merely encouraged states to do so. *See* Argument IV, *infra*. That polite request does not close the gap between project accounting and the statutory text.

EPA's Project Accounting Rule thus fails to set any definite boundary on a source's ability to offset emissions increases with decreases. A source that invokes its "discretion" to rebut EPA's presumptive three-year timeframe, or in a state that declines EPA's invitation to apply that presumption, faces no temporal limit at all. 85 Fed. Reg. at 74,900. That absence is unlawful, even ignoring instances when decreases

follow increases. It violates the basic rule—recognized by *Alabama Power*—that offsetting decreases be "contemporaneous." 636 F.2d at 401-02. As EPA explained when initially promulgating the contemporaneity requirement in 1980, allowing a state to credit any decrease no matter how distant in time from a change—as EPA has here—"violate[s] any common sense notion of what is 'contemporaneous' since a period of contemporaneity must have some definite boundaries." 45 Fed. Reg. at 52,701 ("The state may not … set a period of unreasonable or undefined length.").

### III. EPA Has Not Explained How Its "Reasonable Possibility" Recordkeeping Rules Ensure Compliance with Project Accounting.

By permitting sources to offset decreases against increases at the threshold "Step 1" significance inquiry, EPA discarded any requirement that such decreases be enforceable. 85 Fed. Reg. at 74,898. *New York,* 413 F.3d at 33-34. The Agency asserts that its regulations' "reasonable possibility" recordkeeping requirements, which govern projects claiming insignificant *increases* under Step 1 of EPA's applicability test, nonetheless ensure that offsetting *decreases* occur and are "real and permanent." 85 Fed. Reg. at 74,898. But the regulations' recordkeeping

and reporting requirements apply only to projects that EPA classifies as posing a "reasonable possibility" of a significant emissions increase: those with projected emissions at or above 50% of EPA's *de minimis* thresholds. 40 C.F.R. § 52.21(r)(6); 89 Fed. Reg. at 36,876. All other projects require *no* recordkeeping or reporting, eliminating any means of assuring compliance. *New York,* 413 F.3d at 35-36. That prevents EPA's reasonable possibility rules from assuring that sources using project accounting comply with the Act.

EPA adopted its "reasonable possibility" requirements when its rules forbade project accounting, and only increases were considered at Step 1 of the New Source Review applicability analysis. Reasonable possibility recordkeeping consequently sought only to ensure that sources accurately estimated emissions *increases* at that threshold step; they guard against the possibility that sources might mischaracterize a project's emissions increase as insignificant by "erroneously understat[ing] emissions" through "possible calculation errors." 72 Fed. Reg. at 72,609. Excluding projects with expected emissions below 50% of the significance threshold was meant to exempt projects "sufficiently small" that such errors were unimportant. *Id*. at 72,611.

But now that EPA has inserted netting into the Step 1 analysis, its recordkeeping and reporting need to address more than calculation errors. They need to ensure that decreases used to avoid New Source Review "actually occur." 89 Fed. Reg. at 36,883. EPA's current recordkeeping requirements—covering *only* projects for which the plant-owner predicts an increase at or above 50% of the significance threshold—cannot provide that assurance.

Project accounting allows plant-owners to undertake large changes— *e.g.,* adding an entirely new emissions unit emitting hundreds of tons per year—but avoid New Source Review by promising to remove some other similar unit. Whether such a project results in a significant emissions increase does not depend on the magnitude of "possible calculation errors." 72 Fed. Reg. 72,609. It depends on whether the owner actually removes the unit. *See* 45 Fed Reg. at 52,701 (EPA's original decision to require decreases to be enforceable was "to ensure that the decrease is real and that it remains in effect.").

Yet projects of that sort—where large increases are paired with large decreases such that the *net* increase is less than 50% of the significance threshold—need not retain the records or report the emissions that

would allow permitting authorities or the public to "ensure that sources are not escaping NSR" unlawfully. *New York,* 413 F.3d at 34. EPA offers no reason why such projects pose no "reasonable possibility" of a violation. The 50% threshold bears no rational relationship to whether promised decreases actually occur.[14] Indeed this Court upheld EPA's "reasonable possibility" rules in part because at the time they "exclude[d] netting analyses from projected emissions calculations." *New Jersey v. EPA*, 989 F.3d 1038, 1050 (D.C. Cir. 2021).

EPA's determination that reasonable possibility recordkeeping nonetheless serves as an "effective way to ensure that a reviewing authority" has "information necessary to enforce NSR requirements," 84 Fed. Reg. at 39,251 consequently lacks a "'rational connection between

---

[14] EPA also admitted that their limited scope prevented its recordkeeping rules from providing a means to determine whether projects met the "substantially related" test—further undermining enforceability. 89 Fed. Reg. at 36,883 (under reasonable possibility rules "the reviewing authority may not be able to verify that activities were properly aggregated").

the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983) (citation omitted).[15]

## IV. EPA Has Arbitrarily Premised Project Accounting on Limitations It Has Not Imposed.

EPA's adoption of project accounting—and, in particular, its central claim that such accounting is "sound policy," because it encourages "emissions decreases" outweighing any circumvention of New Source Review—was premised upon the Agency's assumption that such accounting would be limited by "the 'substantially related' test." 85 Fed. Reg. at 74,894-95. EPA acknowledged at the outset that allowing project accounting "might" make it "possible to circumvent NSR through some wholly artificial grouping of activities"—that is, a source

---

[15] EPA claimed to "expect" that most (but not all) changes escaping New Source Review *via* project accounting would be subject to state "minor" new source permitting, conducted to ensure that smaller sources do not prevent achievement of air quality standards, 85 Fed. Reg. at 74,901. *See NRDC v. EPA*, 571 F.3d 1245, 1280 (D.C. Cir. 2009). But EPA's Reconsideration Proposal admitted that states and others "had confirmed the sparsity of information" provided during minor source permitting. 87 Fed. Reg at 36,885 (permits often lack "information on how the applicability analysis was conducted, thereby impeding verification of a source's determination that a major NSR permit is not required under a given circumstance"). And EPA admitted that some sources using project netting "may be excluded" from minor source permitting "altogether." *Id.* at 36,872.

might structure its "project" to include just those activities that produce no net significant increase in emissions, ignoring other emissions-increasing activities at the source. JA__ (Pruitt Memo 9). When it promulgated the Project Accounting Rule, EPA's sole response to comments raising the likelihood of such circumvention was that "the 'substantially related test' from our 2018 final action on project aggregation … provides the appropriate basis for sources to determine the scope of [the] project." 85 Fed. Reg. at 74,900 (claiming test confines projects to activities with "an apparent technical or economical interconnection"). The Agency recognized that without application of that test, project accounting "could potentially allow" sources to artificially group various changes into "projects" "with the sole purpose of avoiding NSR." JA___ (Comments Response at 76).

EPA did not, however, require that state permitting authorities (who generally administer New Source Review requirements) limit project accounting to "substantially related" activities: "[S]tate and local air agencies with approved [plans] are … not required to amend their plans to adopt the interpretation that projects should be aggregated when 'substantially related.'" 85 Fed. Reg. at 74,895 n. 57. *See also id.* at

74,900 n.85 (acknowledging that definition of "project" does not include "'substantially related'" criteria). The Agency has merely "encouraged" the administering state agencies to follow the substantially related test. 83 Fed. Reg. at 57,238-39. EPA has since approved state implementation plans without the test, confirming its optional nature. 90 Fed. Reg. 21,232, 21,233-34 (May 19, 2025).

EPA has thereby "bas[ed] its decision on a premise" that the agency has simultaneously decided "to disrupt." *Portland Cement Ass'n v. EPA,* 665 F.3d 177, 187 (D.C. Cir. 2011). The Agency has admitted that it "predicated finalization of the [Project Accounting] rule on the basis that" the substantially related test "or some analogous definition of project, would be applied by permitting authorities to prevent circumvention of the NSR program requirements with the application of [project accounting]." 89 Fed. Reg. at 36,878-79. And "[y]et [EPA] did not establish such a requirement in the rule." *Id.* at 36,879.

EPA has admitted that its regulations "may not be sufficient to guard against the potential for sources to selectively aggregate or disaggregate multiple projects … in a manner that is contrary to the intent of the" Act. *Id.* at 36,878. And it has acknowledged that merely

encouraging states to apply the "substantially related" test has not produced adherence. EPA's Project Aggregation Action (the origin of the substantially related test) similarly failed to require adoption of the test into state plans. *Id.* EPA observed that as a result sources have "not aggregated" activities into a single project "despite evidence that they were substantially related"—and those oversights have occurred "without documentation." *Id.*

EPA's rule consequently allows sources to circumvent New Source Review "in a manner that is contrary to the intent of the [Act]," *id.,* even while it rests almost entirely on the Agency's claim that project accounting "is consistent with congressional intent" to "reduce emissions," 85 Fed. Reg. at 74,894. That is arbitrary and capricious. *Portland Cement,* 655 F.3d at 187. EPA's decision "rest[s] on an assumption" that it admits to be false, depriving its action of "a satisfactory explanation." *Ohio v. EPA,* 603 U.S. 279, 293 (2024). And EPA has "failed to explain how it can ensure NSR compliance" under the rule it adopted, further underscoring that rule's arbitrariness. *New York,* 413 F.3d at 35-36 (finding rule arbitrary where EPA rule fails to ensure that data ensuring compliance will be available).

## CONCLUSION

Petitioners request that this Court vacate the Pruitt Memo and the Project Accounting Regulation.[16]

Respectfully submitted,

*/s/Sanjay Narayan*

Sanjay Narayan
Sierra Club Environmental Law Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
(415) 977-5769
sanjay.narayan@sierraclub.org

*Counsel for Sierra Club*

Keri N. Powell
Southern Environmental Law Center
10 10th Street NW, Ste. 1050
Atlanta, GA 30309
(917) 573-8853
kpowell@selc.org

*Counsel for Sierra Club and Environmental Integrity Project*

Vickie L. Patton
Surbhi Sarang
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder, CO 80302
(303) 447-7214
vpatton@edf.org
ssarang@edf.org

*Counsel for Environmental Defense Fund*

John Walke
Emily Davis
Natural Resources Defense Council
1152 15th St., NW, Ste. 300
Washington, D.C. 20005
(202) 289-6868
jwalke@nrdc.org
edavis@nrdc.org

*Counsel for Natural Resources Defense Council*

---

[16] Vacatur would end project accounting, remedying plaintiffs remaining harms from all actions challenged here.

69

Caroline E. Cress
Southern Environmental Law
Center
136 E. Rosemary St., Ste. 500
Chapel Hill, NC 27514
(919) 945-7129
ccress@selc.org

*Counsel for Sierra Club and*
*Environmental Integrity Project*

Dated: November 19, 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32 because it contains 12,951 words, excluding the parts of the filing exempted by Rule 32(f). This brief also complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6), respectively, because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*/s/Sanjay Narayan*
Sanjay Narayan

*Counsel for Sierra Club*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2025, I served the foregoing Petitioners Proof Opening Brief on all registered counsel through the Court's electronic filing system (CM/ECF).

/s/ *Sanjay Narayan*
Sanjay Narayan

*Counsel for Sierra Club*